FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SEENA MOSS and CHASE PARKER,**<br>          Plaintiffs, | **CIVIL ACTION** |
| v. | |
| **AARON'S, INC.,**<br>          Defendant. | **NO. 14-3753** |

## MEMORANDUM OPINION

**I.     INTRODUCTION**

      This case arises from a dispute over payment for a high-definition television and Blu-ray player. Plaintiffs Seena Moss ("Moss") and Chase Parker ("Parker") allege that Defendant Aaron's, Inc. ("Aaron's") trespassed on their land when its employees came to their house concerning payment for the electronics.[1] Defendant has asserted counterclaims for breach of contract against Moss, and conversion, fraud, and unjust enrichment against both Plaintiffs arising from allegations that they did not pay in full for the merchandise. Plaintiffs and Defendant have both moved for summary judgment on Defendant's liability for trespass. Defendant has also moved for summary judgment to limit Plaintiffs to nominal damages, as well as summary judgment in favor of its breach-of-contract claim. For the reasons discussed below, the motions will be denied in all respects.

**II.     FACTUAL BACKGROUND**

      Plaintiffs, who are married, have lived in Philadelphia since 2011. Joint Appendix ("JA") 38, 159. Defendant owns and operates rent-to-own stores throughout the United States, including a location in Upper Darby, Pennsylvania. Compl. ¶ 7. From April through September

---

[1] Plaintiffs also asserted a claim under Pennsylvania's Fair Credit Extension Uniformity Act, 73 Pa. Cons. Stat. § 2270.4, which was dismissed by Order of the Court on Feb. 20, 2015. *See Moss v. Aaron's, Inc.*, No. 14-cv-3753, 2015 WL 731836 (E.D. Pa. Feb. 20, 2015).

2013, Parker was an employee in Defendant's Upper Darby store.  JA 157.  Parker's job responsibilities included making site visits to the homes of customers who were delinquent on payments for merchandise.  JA 84.  Parker testified in his deposition that Defendant encouraged employees to "intimidate individuals into turning over property.  They would want us to stand outside of your house and just be belligerent" in an effort to "make them feel uncomfortable."  JA 83-84.

Several months into his employment with Defendant, Parker became interested in purchasing a television, but was informed that Defendant's policies do not permit employees to open accounts in their own names.  JA 47.  He discussed this situation with Moss, who agreed to allow him to open an Aaron's account in her name for the purposes of purchasing a new television.  JA 197.  Moss testified at her deposition that she was unaware that she would be financially responsible for merchandise purchased with this account.  JA 197.

Parker gave Moss's information to his manager at the store, Maribel Leon ("Leon"), and Leon set up an Aaron's account in Moss's name in late August 2013.  JA 46.  No paperwork was presented to Parker at the time, and neither he nor Moss (who never visited the store) signed any documents concerning the account.  JA 49, 196.  The account was then used to purchase a 70-inch high-definition television and a Blu-ray player.  JA 46-47.  Parker agreed with Leon to make $70 cash payments directly to Leon every two weeks for 24 months to pay for the merchandise.  JA 49.  The television and Blu-Ray player were delivered to Plaintiffs' residence within a week.  JA 54.  Defendant has produced computerized records purportedly memorializing a purchase in Moss's name of a Blu-ray player and "Sharp" high-definition television on August 22, 2013.  JA 1-2.  Plaintiffs admit that the description of the Blu-ray player in the computer record matches the Blu-ray player they obtained from Defendant, but assert that

the television they received—and still possess—is a Vizio, not a Sharp. Pls.' Statement of Disputed Facts ¶ 22. Parker testified that he made two $70 cash payments to Leon after the television was delivered. JA 55. Defendant's computer records indicate that payments were made for both the "Sharp" television and the Blu-ray player on August 28, 2013. JA 2-3.

On September 27, 2013, Parker was terminated as an employee of Defendant for reasons unrelated to this case. JA 58. After his termination, Parker stopped making payments to Leon. JA 55-56. Shortly thereafter, Defendant's employees made several calls to the telephone numbers associated with Moss's account. JA 58. Moss did not answer or return any of the calls. JA 62. Instead, Parker contacted Leon and indicated that he would resume making payments on the merchandise when he obtained new employment. JA 58-60. Parker's conversations with Leon did not stop Defendant's phone calls. JA 61.

After its efforts to contact Moss by telephone proved unsuccessful, Defendant sent employees to Plaintiffs' home. There is a dispute concerning the number of visits that occurred. The parties agree that one was on the evening of October 31, 2013. Def.'s Statement of Disputed Facts ¶ 33; Pls.' Statement of Undisputed Facts ¶ 33. Plaintiffs claim that three prior visits occurred during the day on October 15, October 19, and October 31, 2013. They have produced three placards allegedly left by Defendant's employees on those three dates. The placards each display Defendant's logo in large print, and a message that "Aaron's Came by _____ at ____." JA 6-8. The blank spaces on the placards contain handwritten dates and times indicating visits were made on October 15, 2013 at 12:53 p.m.; October 19, 2015 at 10:15 a.m.; and October 31, 2013 at 9:23 a.m. *Id.* The placards also contain notes threatening to return to the premises with law enforcement if merchandise was not returned. *Id.* Defendant has no record of site visits to

Plaintiffs' residence on the dates and times indicated on the placards, and has not admitted that these three visits occurred.  Def.'s Statement of Disputed Fact ¶¶ 30-32.

Defendant does, however, concede that a site visit occurred on Halloween night, October 31, 2013.  JA 127.  Defendant's employees Lebaron Alejandro ("Alejandro") and Brian Kenner ("Kenner") appeared at Plaintiffs' front door at 8:45 p.m.  JA 127.  Parker testified at his deposition that he and Moss were upstairs putting their son to bed when Parker

> heard a loud banging and repeated taps on our glass window, and it seemed to be with a key or something, but it was repeated, and it was loud.  It was alarming.  It kind of made my wife feel uncomfortable.  She seemed to be nervous to find out like why is somebody knocking on our door this late.  It was Halloween.  You didn't know what somebody could be doing.  Mind you, it's too late for kids to be out tricker-treating [sic].  It was already dark.

JA 104.[2]  Prior to answering the door, Parker retrieved an unloaded replica Beretta BB gun.  JA 105.  Upon opening the door, Parker saw Alejandro, who he had never met.  JA 106.  With the replica Baretta visible, Parker directed Alejandro to move away from the door and asked him why he was there.  JA 106.  As Alejandro backed away from the door, Parker stepped outside and saw Brian Kenner (who had fired Parker from Aaron's) near the window "getting ready to knock on the window again."  *Id.*  It was then that Parker realized the two men were Defendant's employees.  *Id.*  Kenner and Parker exchanged heated words concerning the purpose and timing of the visit.  *Id.*  Kenner then asked to see Moss.  *Id.*  Parker refused and threatened to call the police if Alejandro and Kenner did not leave immediately.  *Id.*  Kenner said he would wait for Moss.  *Id.*  At that point, Parker stepped back inside and closed the door.  *Id.*  As the door was closing, Parker heard Kenner threaten to call the police.  *Id.*  He then went upstairs to check on his son, who had awoken during the incident.  *Id.*

---

[2] Defendant has not presented testimony from Alejandro, Kenner, or any other witnesses.  Thus, Plaintiffs' deposition testimony is the only evidence in the record concerning the details of the incident on October 31, 2013.

4

While Parker was returning his son to bed, the police knocked on Plaintiffs' front door. *Id.* Parker answered the door. *Id.* Following questioning, Parker was arrested on charges of simple assault, making terroristic threats, and possessing an instrument of crime. JA 177. Parker then spent two days in jail while Moss collected $1,000 to post his bail. JA 201. The charges were later dropped after Alejandro and Kenner failed to appear as witnesses. JA 179.

Moss testified that she experienced migraines, shoulder pain, and an exacerbation of her fibromyalgia from "not knowing whether they would actually come back again, or not knowing whether you would be harmed in any way over a television." JA 202. Parker testified that during the encounter with Alejandro and Kenner he "was uncomfortable . . . extremely nervous . . . did not know what was going on . . . [and] was pretty much scared . . . because you could open the door, somebody could rush in and try to hurt my wife and my children." JA 104-05. The interaction left him "upset and a little shaken" with "a lot of anxiety." JA 106. In the aftermath of October 31, 2013, Parker "didn't really eat much . . . had a hard time sleeping . . . [and] had anxiety for quite a while" because "it could have been people hurting my kids. It could have been somebody hurting my wife. And yet I'll [sic] still get arrested for it." JA 134.

### III.   LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).

### IV. DISCUSSION

#### A. *Trespass Liability*

Trespass claims in Pennsylvania are governed by the Restatement (Second) of Torts. *Gilbert v. Synagro Cent., LLC*, 90 A.3d 37, 52 (Pa. Super. Ct. 2014); *see also Woodham v. Dubas*, 256 F. App'x 571, 576 (3d Cir. 2007). A plaintiff must show that defendant made an "unprivileged, intentional intrusion upon land in possession of another." *Boring v. Google, Inc.*,

362 F. App'x 273, 280 (3d Cir. 2010) (citation omitted).  Proof of damages is not required to impose liability for trespass.  *Id.* at 281.

Defendant disputes whether the alleged site visits to Plaintiffs' home occurred on October 15, 19, and in the morning of October 31, 2013.  Def.'s Statement of Disputed Facts ¶¶ 30-32.  Defendant notes that Parker had access to Aaron's placards from his time as an Aaron's employee, and thus could have obtained the placards himself.

The parties agree that Defendant's employees made a site visit to Plaintiffs' home on the evening of October 31, 2013.  However, Defendant argues that this intrusion and any other site visits that occurred were not trespasses for two reasons.  First, Defendant claims that it was induced to make the site visits by Plaintiffs' conduct.  Second, Defendant argues that any visits that occurred were privileged by an implied license to approach Plaintiffs' property to attempt to speak with Plaintiffs.

To support its inducement argument, Defendant relies on section 164 of the Restatement (Second) of Torts.  However, this section of the Restatement governs "Intrusions Under Mistake," and the provision Defendant cites excuses only a "merely harmless intrusion on land under a mistake."  Restatement (Second) of Torts § 164 cmt. b (1965).  Defendant does not claim that its employees visited Plaintiffs' residence by mistake.  Accordingly, Defendant's inducement argument is without merit.

Defendant's legal citations in support of its implied license argument are not so readily dismissed.  In the course of adopting the Restatement approach to define a trespass, Pennsylvania courts have turned to section 330 of the Restatement (Second) of Torts, which concerns licensees and is instructive in deciding whether Defendant here had an implied license to go on to Plaintiffs' property.  *See Longbottom v. Sim-Kar Lighting Fixture Co.*, 651 A.2d 621, 623 (Pa.

7

Commw. Ct. 1994). Section 330 provides that "[a] licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent," Restatement (Second) of Torts § 330 (1965), and the comments thereto note that consent may be granted not only by explicit invitation, but also by acts upon "consideration [of] all the surrounding circumstances," including "customs prevailing in the community." Restatement (Second) of Torts § 330 cmt. c (1965). By definition, the scope of the license turns on the specific factual circumstances presented in a given case. Pennsylvania courts have not set forth guidance for analyzing the implied license, but useful principles have emerged in recent jurisprudence.

More specifically, the United States Supreme Court has described the implied license as permission to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida v. Jardines*, 133 S. Ct. 1409, 1415 (2013).[3] The license is limited; it does not apply to situations in which the prevailing customs of the community would not condone an unsolicited visit. One limitation is the purpose of the visit. For example, the Supreme Court in *Jardines* held that the license did not apply to a visit solely for the purpose of conducting a dog-sniff search, with no attempt to speak to the occupant. *See Jardines*, 133 S. Ct. at 1416 (noting that the license "is limited not only to a particular area but also to a specific purpose . . . the background social norms that invite a visitor to the front door do not invite him there to conduct a search"). Time of day is another limitation. "Courts have emphasized that the implied license to visit is generally understood to extend during daylight

---

[3] In *Jardines*, the Supreme Court invoked trespass law generally, and specifically the license "'implied from the habits of the country,'" to analyze residential searches under the Fourth Amendment. *Florida v. Jardines*, 133 S. Ct. 1409, 1415 (2013) (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922)). The Supreme Court's analysis of trespass law to inform a Fourth Amendment holding in *Jardines* is not binding on this Court's evaluation of Pennsylvania trespass law, particularly in a matter which does not implicate the Fourth Amendment. However, *Jardines* and the Fourth Amendment jurisprudence emerging from it present the most recent and thoroughly reasoned analysis of the purpose and limits of this implied license. In light of the sparse guidance from Pennsylvania courts, the Court will consider reasoning from *Jardines* and other courts' application of *Jardines* to further elucidate the contours of the implied license recognized by the Restatement.

hours." *United States v. Lundin*, 47 F. Supp. 3d 1003, 1013 (N.D. Cal. 2014); *see also Jardines*, 133 S. Ct. at 1422 (Alito, J., dissenting) ("Nor, as a general matter may a visitor come to the front door in the middle of the night without an express invitation."). This lack of an implied license at night arises from community disapproval of late-night intrusions. As the Supreme Court of Kentucky has noted, "Girl Scouts, pollsters, mail carriers, [and] door-to-door salesmen just do not knock on one's door at midnight; and if they do, they are more likely to be met by an enraged (and possibly armed) resident than one with a welcoming smile." *Commonwealth v. Ousley*, 393 S.W.3d 15, 30 (Ky. 2013). Although Pennsylvania courts have not specifically analyzed the limits of the implied license, neither the parties nor the Court have located any authority to suggest that Pennsylvania would depart from the principles articulated by the Restatement, as discussed by the United States Supreme Court and elaborated upon by other state and federal courts. Accordingly, the Court finds that Pennsylvania law recognizes the implied license to approach a residence and knock on the door in an effort to speak with the occupant, and that the scope of this license is determined by the "prevailing customs of the community."

The three alleged daytime visits on October 15, 19, and 31, 2013, if they occurred, do not support a trespass claim. The only evidence concerning these visits is the three placards that were allegedly left on Plaintiffs' front door. From this evidence, the most that a fact finder could rationally infer is that an employee or employees of Defendant approached Plaintiffs' front door in the late morning or early afternoon and left letter-sized placards with a brief message when nobody answered the door. Any conclusion that Defendant's employees did more than this would be speculative. This specific activity—approaching a home to speak with the occupants during daylight hours—is at the heart of the implied license. Without evidence of anything more

9

than attempts to speak with Plaintiffs and placards seeking follow-up, there is no rational basis on which a fact finder could conclude that the implied license was exceeded. Accordingly, Defendant is not liable for trespass arising from these alleged daytime visits.

Defendant's employees' status as invitees on the evening of October 31 cannot, however, be determined as a matter of law. The visit occurred at 8:45 p.m.: a time at which a fact finder could reasonably conclude, given the facts presented in the record before the Court, that the prevailing customs in the community have implied a license to approach and knock, but could also reasonably find that community customs do not imply such a license. Furthermore, Plaintiffs have alleged that even if a license can be implied at that time in the evening, Defendant's employees' purpose and conduct exceeded the scope of the license. The record is not sufficient to determine the specific purpose of Alejandro and Kenner's visit, their conduct during the visit, or how long they lingered after being asked to leave. Since Defendant's liability for trespass turns on the existence of the implied license and whether any such license was exceeded, there remain genuine issues of material fact and summary judgment cannot be granted for either party on this claim.

## B. *Trespass Damages*

In Pennsylvania, a "trespasser becomes liable not only for personal injuries resulting directly and proximately from the trespass but also for those which are indirect and consequential." *Kopka v. Bell Tel. Co.*, 91 A.2d 232, 235-36 (Pa. 1952); *see also* Restatement (Second) of Torts § 162 (1965) ("A trespass on land subjects the trespasser to liability for physical harm to the possessor of the land at the time of the trespass . . . or to members of his household . . . caused by any act done, activity carried on, or condition created by the trespasser.").

Parker testified under oath that, after the incident on the evening of October 31, 2013, he "didn't really eat much . . . had a hard time sleeping . . . [and] had anxiety for quite a while." JA 134. Immediately before describing these injuries, Parker said that "[I]t could have been people hurting my kids. It could have been somebody hurting my wife. And yet I'll still get arrested for it." JA 134. While it could be inferred that his anxiety arose from the arrest, there is a genuine issue of fact whether the nighttime encounter with Defendant's employees' was itself the cause of anxiety-related injuries. The alleged causal attribution of Moss's headaches, shoulder pain, and fibromyalgia is even more direct. She was not arrested and the description she provided at deposition of the cause of her anxiety was "just not knowing whether or not they would actually come back again, or not knowing whether or not [she] would be harassed over a television." JA 202. Defendant presented no evidence to dispute these injuries. A reasonable fact finder could credit Parker's and Moss's testimony, and thus award compensatory damages.

Plaintiffs also seek punitive damages. In Pennsylvania, punitive damages "must be supported by evidence sufficient to establish that (1) a defendant has a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchinson v. Luddy*, 870 A.2d 766, 772 (Pa. 2005). Punitive damages may be awarded even without compensatory damages under Pennsylvania law, so long as there is a finding of liability on the underlying tort. *See Rhoads v. Heberling*, 451 A.2d 1378, 1380 (Pa. Super. Ct. 1982) ("Pennsylvania has adopted the rule of punitive damages as set forth in § 908 of the Restatement of Torts and the comments thereunder.") (citations and internal quotations marks omitted); Restatement (Second) of Torts § 908 cmt. c (1965) ("[A]n award of nominal damages is enough to support a further award of punitive damages, when a tort, such as a trespass to land, is committed for an outrageous

11

purpose."). When punitive damages are awarded along with compensatory damages, the punitive damages need not be proportional to the compensatory damages. *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 803-04 (Pa. 1989).

In this case, Plaintiffs have introduced testimony that Defendant encouraged employees to use aggressive tactics during site visits to make customers feel "uncomfortable." JA 84. Given the timing of the October 31 evening visit and Defendant's employees' conduct during that visit, a fact finder could conclude that the visit constituted outrageous conduct carried out in conscious disregard of the risk of anxiety-based harm to the Plaintiffs—a conclusion that would warrant the imposition of punitive damages. Thus, summary judgment limiting Plaintiffs to nominal damages must be denied.

### C. *Breach of Contract*

In Pennsylvania, "[t]he formation of a valid contract requires the mutual assent of the contracting parties." *Degenhardt v. Dillon Co.*, 669 A.2d 946, 950 (Pa. 1996). Plaintiffs dispute whether the computerized record of the purchase of a Sharp television produced by Defendant concerns the television that Plaintiffs obtained from Defendant, which Plaintiffs maintain is a Vizio. Pls.' Statement of Disputed Facts ¶ 22. Furthermore, even if the reference to a "Sharp" television is the result of a computer-input error and the computerized record is related to the television in Plaintiffs' residence, Plaintiffs dispute that any contract was formed between Defendant and Moss (or any other party) concerning the purchase of the television or the Blu-ray player. Defendant has not set forth evidence that Moss knew the essential terms of the alleged contract to purchase the merchandise from Defendant, let alone assented to such terms. Nor has Defendant presented arguments or authority concerning Moss's liability for contracts entered into by Parker as an agent on Moss's behalf. Given Moss's testimony that she did not know that

she was financially responsible for the merchandise, the lack of evidence that she ever communicated directly with Defendant concerning the merchandise, and the discrepancies between the information contained in Defendant's records and the actual merchandise Plaintiffs' admit to possessing, a rational fact finder could conclude that Moss never entered into a contract with Defendant.  Accordingly, summary judgment on Defendant's breach of contract counterclaim must be denied.

**V.     CONCLUSION**

For the reasons stated herein, Plaintiffs' and Defendant's motions for summary judgment are denied in all respects.  An appropriate order will follow this opinion.

**Dated:  October 21, 2015**

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____
**WENDY BEETLESTONE, J.**